IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

N.N., a minor, by S.S., the parent and next
friend of N.N., individually and on behalf
of others similarly situated,

OPINION and ORDER

               Plaintiff,

08-cv-581-bbc

     v.

MADISON METROPOLITAN SCHOOL DISTRICT,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In 2007, plaintiff N.N. was a freshman at Madison East High School.  She requested a transfer to a different school district for the following year, but defendant Madison Metropolitan School District denied the request on the ground that plaintiff's transfer would "increase racial imbalance" in the school district.  Plaintiff brought this lawsuit under 42 U.S.C. §§ 1981 and 1983, contending that defendant's decision was unlawful race discrimination in light of Parents Involved in Community Schools v. Seattle School Dist. No. 1, 551 U.S. 701 (2007), in which the Supreme Court concluded that two school districts (Seattle and Louisville) violated the equal protection clause by using a student's race in determining placement at a particular school.  Plaintiff seeks damages only; after the

1

Court decided <u>Parents Involved</u>, defendant stopped relying on a student's race when deciding transfer requests.

In a previous order, I granted plaintiff's motion to certify a class under Fed. R. Civ. P. 23(b)(3) for "[a]ll students residing in the Madison Metropolitan School District who were denied transfer to another school district, for one or more of the school years from 2002-2003 through 2007-2008, under the provisions in the district's full-time open enrollment program that limited student transfers that increase a racial imbalance." Dkt. #34. Plaintiff has sent out notices to class members and the deadline for opting out has passed.[1] Defendant's motion for summary judgment is now fully briefed. Dkt. #44.

Defendant drafted its motion on the assumption that its use of race in making transfer decisions was unlawful. It does not argue that its decisions were narrowly tailored to satisfy a compelling government interest, as it would be required to do in order to satisfy the strict scrutiny review set forth in <u>Parents Involved</u>. Moreover, it does not argue that it reasonably believed before <u>Parents Involved</u> that it was acting lawfully, because such a defense (called "qualified immunity" in legal jargon) is not available to municipalities such

---

[1] Initially, the deadline for opting out was September 21, 2009, but I extended the deadline to October 23 when counsel for plaintiff reported that he was having problems contacting some of the class members. Dkt. #41. In the same order, I instructed counsel to inform the court if he needed additional time or if he was unable to locate the remaining class members. I understand counsel's silence on this issue to mean that he has provided individual notice to each member of the class.

as school districts.  <u>Owen v. City of Independence</u>, 445 U.S. 622, 650 (1980); <u>Nabozny v. Podlesny</u>, 92 F.3d 446, 455 (7th Cir. 1996).

Instead, defendant says it should not be held liable for money damages because it was compelled to act by Wis. Stat. § 118.51(7), which required defendant to "reject any application for transfer into or out of the school district . . . if the transfer would increase racial imbalance in the school district."  Under cases such as <u>Bethesda Lutheran Homes and Services, Inc. v. Leean</u>, 154 F.3d 716, 718 (7th Cir. 1998), a municipality "cannot be held liable under section 1983 for acts that it did under the command of state or federal law."

Thus, the primary question raised by defendant's motion for summary judgment is whether state law or school district policy is responsible for the violations of federal law.  Is this an example of the school district taking advantage of an ambiguous statute in order to justify its own unconstitutional actions or did the state's mandate leave the school district no constitutional alternative? I conclude it is the latter.  Although plaintiff emphasizes that § 118.51(7) gave defendant discretion to adopt its own definition of "increase racial imbalance," no definition consistent with the statute would also be consistent with <u>Parents Involved</u>.  In that case, a majority of the Court concluded that the plans at issue violated the equal protection clause because they made a student's race "determinative standing alone" in the context of student placement, which is just what § 118.51(7) required defendant to do.  It is possible that defendant could have defined "imbalance" using different percentages

3

so that the class members' transfer requests would be allowed, but that is not an appropriate basis for holding defendant liable under § 1983.  Defendant was doing nothing more than implementing a state law directive; it was not making its own policy choice about the use of race in making transfer decisions.  Because the same standard for municipal liability applies to plaintiff's claim under § 1981, defendant's motion for summary judgment must be granted in full.

Initially, defendant made several other arguments in support of its summary judgment motion:  (1) the student transfer policy was developed by the superintendent, who did not make policy for the school district; (2) defendant is entitled to sovereign immunity because it was acting as an arm of the state (defendant did not include this ground in its original answer, so it has filed a motion for leave to amend its answer, dkt. #42, which will be granted as unopposed); and (3) plaintiff's claim for the 2002-2003 school year is barred by the statute of limitations.  Defendant withdrew the first argument in its reply brief.  Because I am granting defendant's motion in full on the ground that plaintiff's alleged injuries were not caused by a municipal policy, I need not consider the other arguments.

One other motion is before the court, which is plaintiff's motion to "strike" an argument that defendant raised for the first time in its reply brief regarding the statute of limitations for the § 1981 claim.  Dkt. #150.  This motion will be denied as moot.

From the parties' proposed findings of fact and the record, I find that the following

4

facts are undisputed.

## UNDISPUTED FACTS

Wisconsin has enacted an "open enrollment" statute, which creates a procedure under which public school students may apply to attend a school in a district other than the district of their residence.  Wis. Stat. § 118.51.  However, transfer is not available in all circumstances.  A provision called "racial balance" provides the following exception:

> The school board . . . shall reject any application for transfer into or out of the school district . . . if the transfer would increase racial imbalance in the school district. A pupil who transfers out of a school district under subch. VI of ch. 121 shall not be counted in that school district's membership, as defined in s. 121.004(5), for the purpose of determining the school district's racial balance under this paragraph.

Wis. Stat. § 118.51(7).  The statute directs school districts to adopt a resolution "specifying . . . the limitation on transfers into or out of the school board under sub. (7)."  Wis. Stat. § 118.51(4)(a)5.

According to guidelines that defendant issued in April 1998, defendant "delegated to the Superintendent the authority to define the terminology 'increase in the racial imbalance in the Madison Metropolitan School District.'"  The superintendent "defined racial imbalance as not increasing the minority student population (1) by no more than .04% in the [school district] as a whole, (2) by less than a .5% increase in the minority population

5

at any particular school, and (3) by not increasing the minority student population in schools in which the minority population already exceeds 40%." (Although the policy seems to make no sense as written, neither party acknowledges the problems with the wording or suggested that it was transcribed incorrectly. Presumably the policy means that defendant would not grant a transfer request if doing so would increase "the minority student population" by more than .04% in the district "as a whole" or by .5% or more at any particular school or if the request came from a school in which the minority population already exceeded 40%.) In 2005, the superintendent changed the last percentage from 40 to 43.

Defendant defined "minority student" using the same definition used to define "minority group pupil" in Wis. Stat. § 121.845(2), which is "a pupil who is Black or African American, Hispanic, American Indian, an Alaskan native, or a person of Asian or Pacific Island origin." "Nonminority" students included all students who did not come within the "minority" subcategories and were designated "white" or "white, non-Hispanic," for which defendant's open enrollment statistics used an "ethnic" code of "5."

The percentage of minority students in the school district between 2002 and 2008 was as follows: 39 percent in 2002-2003; 41 percent in 2003-2004; 42 percent in 2004-2005; 44 percent in 2005-2006; 46 percent in 2006-2007; and 48 percent in 2007-2008.

During the 2002-2003 school year, defendant denied eight or nine open enrollment

6

transfer applications of nonminority students on the ground that granting them would create a "racial imbalance" within the meaning of the guidelines.  In 2003-2004, there were nine such denials; in 2004-2005 and 2005-2006, there were 72 each year; in 2006-2007, there were 86; and in 2007-2008, there were 125.  If defendant had granted these requests, the percentage of minority students in the district would have increased from .1 to .2 percent in each of those school years.

In February 2007, plaintiff N.N. was a full-time student at Madison East High School.  She filed an application with defendant for transfer under the open enrollment program to either the Waunakee or the Monona Grove School District for the 2007-2008 school year.  Plaintiff's applications listed her "race/ethnicity" as "White, not of Hispanic Origin."  In April 2007, defendant denied plaintiff's application, stating "[i]n accordance with s. 118.51(7), Wis. Stats., and school district policy, the resident school district has determined that permitting this transfer would increase racial imbalance in the school district."  In particular, defendant denied plaintiff's application because East High School had a minority population greater than 43 percent and plaintiff's departure would have caused the school's minority percentage to increase.  Plaintiff appealed the decision to the Department of Public Instruction under Wis. Stat. § 118.51(9).  The department affirmed defendant's decision, concluding that it was not "arbitrary or unreasonable."

On December 20, 2007, the Wisconsin Attorney General issued an opinion in which

7

he concluded that Wis. Stat. § 118.51(7) was unconstitutional under <u>Parents Involved in Community Schools v. Seattle School Dist. No. 1</u>, 551 U.S. 701, 711 (2007).  On January 31, 2008, defendant's counsel informed the school board and superintendent of a new direction being taken by the Department of Public Instruction as a result of the attorney general's opinion.  According to the memo, the department would now "reverse any decision made by a school district relying on the racial imbalance" provision in Wis. Stat. § 118.51(7).  Counsel recommended that the board "set aside the provisions" of its "racial imbalance" policy "pending action of the Wisconsin Legislature or directive from the DPI."

On February 4, 2008, the school board voted to "set aside and refrain from applying those provisions of [defendant's External Transfer Policy for Full-time Students] that establish the maintenance of racial balance, or the avoidance of racial imbalance, as criteria applicable to decisions to grant or deny individual applications for Open Enrollment" for the 2008-2009 school year.  At a meeting on January 12, 2009, the board adopted a revised version of its External Transfer Policy for Full-time Students that removed the requirement to reject the application of any resident student whose transfer out of the district "would increase racial imbalance" in the district and the requirement that the district superintendent implement this restriction by defining what constitutes an "increase" in the district's 'racial imbalance."

OPINION

A.  Claim under 42 U.S.C. § 1983

1. Legal background

The impetus for this lawsuit is Parents Involved in Community Schools v. Seattle School District No. 1, 551 U.S. 701, 711 (2007), in which the Supreme Court concluded that two school districts, Seattle, Washington and Louisville, Kentucky, violated the equal protection clause by using race in determining student placement.  Seattle's plan allowed "incoming ninth graders to choose from among any of the district's high schools, ranking however many schools they wish in order of preference." Id. at 711.  However, if too many students picked the same school, the district used a number of "tiebreakers" to determine placement, one of which was the racial composition of the school. Id.  The district classified all students as "white" or "nonwhite" and used the overall racial composition of the school district (41 percent white, 59 percent nonwhite) as a metric for gauging the appropriate balance in a particular school. Id. at 712.  If a school was more than 10 percent outside the norm, the school would begin to use the tiebreaker to "bring the school into balance." Id.

Under the Louisville plan, schools needed "to maintain a minimum black enrollment of 15 percent, and a maximum black enrollment of 50 percent." Id. at 716.  If a school's racial composition reached "the extremes of the racial guideline," students who would contribute to the imbalance would no longer be placed there. Id.  In addition, any transfer

9

requests made after assignment could be denied "on the basis of the racial guidelines." Id. at 717.

Five justices concluded that both plans violated the equal protection clause, but no single opinion garnered the support of five justices in all respects, an unfortunately frequent result when the Court considers the appropriate use of race in government decision making. E.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995); City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989); Wygant v. Jackson Board of Education, 476 U.S. 267 (1986); Regents of University of California v. Bakke, 438 U.S. 265 (1978).  Chief Justice Roberts issued an opinion joined by three other justices as did Justice Breyer.  Justice Kennedy joined portions of the opinion of the chief justice and he concurred in the conclusion that both plans were unconstitutional.  However, he wrote separately to set forth his own view about the "instances when [race] may be taken into account."  Parents Involved, 551 U.S. at 787 (Kennedy, J., concurring in part and concurring in the judgment).

A majority of the Court agreed that the school districts' use of race to determine student placement was subject to what the Court calls "strict scrutiny" review, meaning that the school districts were required to show that their consideration of race was narrowly tailored to further a compelling government interest.  The Court identified two possible compelling interests, remedying the effects of past discrimination and fostering diversity, but it concluded that the school districts' plans could not withstand strict scrutiny because they

10

were not narrowly tailored.  Id. at 720-24.

Defendant does not argue that its own "racial balancing" plan survives Parents Involved.  In particular, it develops no argument that its plan was narrowly tailored to further an interest in diversity, remedying past discrimination or any other interest.  As further evidence of defendant's tacit concession that its racial balancing plan was unlawful, it abandoned that plan even before plaintiff filed this lawsuit.

Instead of trying to defend the constitutionality of its racial balancing plan, defendant's primary response is to put the blame on the state of Wisconsin.  To the extent it used race to make transfer decisions, defendant says, it was the direct result of Wis. Stat. § 118.51(7).  Under that statute, a "school board . . . shall reject any application for transfer into or out of the school district . . . if the transfer would increase racial imbalance in the school district."  According to defendant, § 118.51(7) left it with no constitutional alternative.

"The culpability of one who harms another under coercion is, and has always been, a subject of intense debate, raising profound questions of moral philosophy and individual responsibility."  Negusie v. Holder, 129 S. Ct. 1159, 1169 (2009) (Scalia, J., concurring).  Similar questions arise for courts determining whether a municipality should be held accountable for implementing an unconstitutional state law or policy.  On one hand, courts emphasize repeatedly that liability under 42 U.S.C. § 1983 is "predicated upon fault," e.g.,

11

Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983), suggesting that municipalities should not be required to pay damages for simply doing what they are told to do.  After all, as the Supreme Court has recognized, municipalities are simply creatures of the state. E.g.,Ysursa v. Pocatello Education Association, 129 S. Ct. 1093, 1100 (2009). They are not protected from "commandeering" by the state as are states by the federal government, Printz v. United States, 521 U.S. 898 (1997), because they have no independent sovereignty. Rather, a municipality derives all of its authority from the state, which may choose to withdraw that authority whenever it wishes.  Trenton v. New Jersey, 262 U.S. 182, 187 (1923) (municipalities are "merely . . . department[s] of the State, and the State may withhold, grant or withdraw powers and privileges as it sees fit").

On the other hand, courts often reject a defense of "I was just following orders" when it is asserted by individual defendants in a civil or criminal case, including cases under § 1983.  E.g., United States v. Funmaker, 10 F.3d 1327, 1331 (7th Cir. 1993) ("It must be clear that defendants cannot circumvent federal prosecution by claiming that they were merely following orders."); O'Rourke v. Hayes, 378 F.3d 1201, 1210 n. 5 (11th Cir. 2004) ("[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order.").  In the context of § 1983, the reason for rejecting such a defense is the idea that, under the

12

Supremacy Clause, public officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior or in a policy.  E.g., Cherry v. Berge, 2003 WL 23095796, *6 (W.D. Wis. June 26, 2003) (prison officials must comply with constitutional requirement to provide needed medication to prisoners regardless of prison policy or instructions of other officers).  But see Coleman v. Houston Independent School District, 113 F.3d 528, 534 (5th Cir. 1997) (reversing district court's order concluding that "a person who gives [an unconstitutional] order and the person who obeys it and takes the action are both responsible and neither is protected by qualified immunity"; court of appeals stated that district court's view  would create "unprecedented rule of vicarious liability").

These competing concerns may be the reason circuit courts have come to varying conclusions on the questions whether and to what extent municipalities may be held liable under § 1983 for following state laws.  The overarching questions in any case involving municipal liability under § 1983 are whether the unconstitutional act "may fairly be said to represent official policy" of that municipality and whether the policy was the "moving force" behind the violation.  Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694 (1978).  Stated another way, the question is whether there is a "direct causal link," City of Canton, Ohio v. Harris, 489 U.S. 378, 386 (1989), between the violation and a "deliberate choice [by the municipality] to follow a course of action . . . made from among various alternatives." Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986).  Although

13

this standard is well established, the Supreme Court has yet to discuss its application in the context a municipality's enforcement of a state law.  In this vacuum, lower courts have come to their own unique conclusions.

For example, in <u>Davis v. City of Camden</u>, 657 F. Supp. 396, 402 (D.N.J. 1987), the court held that § 1983 did not immunize a municipality when it conducted an unconstitutional strip search as a result of a state law mandate.  Although the county admitted that it had a policy adopting the state's law on strip searches, it argued that the "policy was not a 'county policy' as contemplated by <u>Monell</u> and its progeny, but a state policy that county officials merely enforced."   <u>Id.</u> The court rejected this view as a misunderstanding of <u>Monell</u>, which simply requires the municipality to have a policy; <u>Monell</u> does not require an inquiry into the *reason* the municipality adopted the policy. Although the court acknowledged the county's "dilemma," the court stated that municipalities "cannot blindly implement state laws; they are required to independently assess the constitutionality of the laws." <u>Id.</u> at 404.  <u>See also</u> <u>Conroy v. City of Philadelphia</u>, 421 F. Supp. 2d 879, 886 (E.D. Pa. 2006) ("I am persuaded by the detailed reasoning presented in <u>Davis</u> that a municipality may be held liable where it has, in some way, affirmatively adopted the policy or custom—albeit one that is required by the state—which is the driving force behind the alleged violation."); Mark R. Brown, <u>The Failure of Fault under § 1983: Municipal Liability for State Law Enforcement</u>, 84 Cornell L. Rev. 1503,

14

1517-18 (1999) (compliance with state law should not shield municipalities from liability because "the Supremacy Clause still provides local government an excuse not to enforce the measure. States cannot force cities to apply unconstitutional state laws.").

In Garner v. Memphis Police Dept., 8 F.3d 358, 363-64 (6th Cir. 1993), the court took a more nuanced approach, holding that a municipality could be held liable under § 1983 for adopting a policy on excessive force that was *authorized* by state law but not *required* by it. As clarified in Brotherton v. Cleveland, 173 F.3d 552, 566 (6th Cir. 1999), the Sixth Circuit's view is that a county's actions are not a "policy" under Monell or a "deliberate choice" under Pembaur unless the municipality "could have chosen not to use [its] authority under the state statute."

Other courts have adopted additional variations of these positions. Vives v. City of New York, 524 F.3d 346, 353-55 (2d Cir. 2008) (in determining whether city could be held liable for enforcing state law, question was whether "the Police Department's policy makers can instruct its officers not to enforce a given section—or portion thereof—of the penal law"); Cooper v. Dillon, 403 F.3d 1208, 1222-23 (11th Cir. 2005) (city may be held liable for decision to enforce unconstitutional state statute when city had discretion not to enforce it); Whitesel v. Sengenberger, 222 F.3d 861, 872 (10th Cir. 2000) (county "cannot be liable for merely implementing a policy created by the state judiciary. In order to prevail on his claim against the [county, the plaintiff] must demonstrate that the [county] was 'the moving

15

force' behind the" constitutional violation."); <u>Bockes v. Fields</u>, 999 F.2d 788, 791 (4th Cir. 1993) (county could not be held liable under § 1983 for its decision to fire an employee because county "enjoyed its discretion to fire [employees] at the prerogative of and within the constraints imposed by the Commonwealth" through state laws and procedures); <u>Evers v. Custer County</u>, 745 F.2d 1196, 1203 (9th Cir. 1984) (if constitutional violation occurred pursuant to county directive, <u>Monell</u> requirement is met; no immunity for acting in accordance with state law); <u>Familias Unidas v. Briscoe</u>, 619 F.2d 391, 404 (5th Cir. 1980) (county could not be held liable for enforcement of state law because county's actions in that circumstance "may more fairly be characterized as the effectuation of the policy of the State . . . embodied in that statute, for which the citizens of a particular county should not bear singular responsibility"); <u>Lederman v. United States</u>, 2007 WL 1114137, *3 (D.D.C. Apr. 13, 2007) (District of Columbia could be held liable under § 1983 for enforcing regulation that it promulgated under authority of Congress because Congress did not compel District to adopt particular regulation and did not require District to enforce it).  <u>See also</u> Dina Mishra, Comment, <u>Municipal Interpretation of State Law as "Conscious Choice"</u>, 27 Yale L. & Pol'y Rev. 249, 250 (Fall 2008) ("Where a reasonable and constitutional interpretation of a state statute exists, a municipality should be held liable for its 'conscious choice' to enforce an unconstitutional interpretation.")

     Despite their variations, each of these cases is couched as an interpretation of <u>Monell</u>

and subsequent Supreme Court cases on municipal liability regarding the meaning of concepts such as "policy," "deliberate choice," "direct causal link" and "moving force." Although different courts may use a different part of the standard to frame their analysis, all of them seem to be trying to resolve the same question that Justice Scalia raised in Negusie, which is under what circumstances is it fair to impose punishment for "just following orders"?  Some courts believe that a municipality should not have to choose between violating (or even simply ignoring) state law and violating the Constitution; other courts believe that constitutional rights always take precedence over state law.  (In Vives, 524 F.3d at 356, the court hinted at a compromise position, that a municipality could be held liable for complying with state mandates that "are so obviously and deeply unconstitutional that the mere fact of their enforcement gives rise to a strong inference that the municipality must have made a 'conscious choice' to enforce them.")

Taking the former position means that municipalities are protected from the heavy burden of undertaking an independent analysis of every state directive for compliance with the Constitution and risking a standoff with state government whenever the municipality concludes that a particular directive does not pass the test.  However, it also means that victims of constitutional violations may go without a remedy; although the state might seem to be the more appropriate defendant in such cases, the Supreme Court has concluded that Congress did not intend to include states within the reach of § 1983.  Will v. Michigan

17

Department of State Police, 491 U.S. 58 (1989).

This circuit's take on the issue is set forth in two opinions, Surplus Store and Exchange, Inc. v. City of Delphi, 928 F.2d 788, 791-92 (7th Cir. 1991), and Bethesda Lutheran Homes and Services, Inc. v. Leean, 154 F.3d 716, 718 (7th Cir. 1998), but the discussions in both cases are relatively brief and not necessarily completely consistent.  In Surplus Store, the question was whether the city could be held liable for an allegedly unconstitutional deprivation of property (gold rings) on the ground that the city had a "'policy' of allowing or instructing its police officers to enforce" a state statute that permitted the city's police officer to take the rings without providing a hearing.  Id. at 791.

The court gave short shrift to the plaintiff's position:  "It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law. If the language and standards from Monell are not to become a dead letter, such a 'policy' simply cannot be sufficient to ground liability against a municipality."  Id. at 791-92.  Thus, the conclusion of the court in Surplus Store seems to be grounded in a principle similar to proximate cause, that a municipality's policy of "enforcing state law" cannot be the cause or the "moving force" of a constitutional violation because it is the state's law that is the cause in that circumstance.  This conclusion is like the one reached by the courts in Whitesel, 222 F.3d at 872, and Familias Unidas, 619 F.2d at 404.

18

In <u>Bethesda Lutheran</u>, 154 F.3d 716, the underlying issue was the constitutionality of state statutes that rendered nonresidents of Wisconsin ineligible for admission to long-term care facilities for mentally disabled individuals.  After the court concluded that the statutes violated the nonresidents' right to travel, a lingering question was whether Jefferson County could be required to pay money damages for enforcing the statutes.

Without acknowledging that it was doing so, the court seemed to retreat a bit from the statement in <u>Surplus Store</u>, 928 F.2d at 791, that a policy of simply "*enforcing* state law" cannot be the basis for municipal liability under § 1983.  In summarizing the circuit's position on the question, the court aligned itself expressly with the Sixth Circuit's view in <u>Garner</u>, 8 F.3d 858, that a municipality "cannot be held liable under section 1983 for acts that it did under the *command* of state or federal law." <u>Bethesda Lutheran</u>, 154 F.3d at 718 (emphasis added).  The court explained its conclusion in the following manner:

> The plaintiff who wants a judgment against the municipality under [§ 1983] must be able to trace the action of the employees who actually injured him to a policy or other action of the municipality itself. When the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury.

<u>Id.</u>  This discussion seems to shift focus somewhat from the element of causation (as in <u>Surplus Store</u>) to the question whether a municipality's compulsory act can qualify as a "policy" or a "deliberate choice" of the municipality under <u>Monell</u>.  The court acknowledged

19

that the rationale was "formalistic," but it added a pragmatic justification for the rule, which is that it "minimiz[es] the occasions on which federal constitutional law, enforced through section 1983, puts local government at war with state government."  Id.

_____In Vives, 524 F.3d at 352 n.2, the Court of Appeals for the Second Circuit described Bethesda Lutheran's implicit limitation on Surplus Store as "dicta," raising a question of which standard is controlling.  (Since Bethesda Lutheran, it does not appear that the Court of Appeals for the Seventh Circuit has revisited the question.)  Surprisingly, the parties do not discuss the tension between Bethesda Lutheran and Surplus Store.  Because it does not affect the outcome of the case, I will apply the standard in Bethesda Lutheran, which is more favorable to plaintiff.


2.  Municipal liability under § 1983 for implementing a state statute

Whether it is framed as an issue of "causation," "policy" or "choice," the question under Bethesda Lutheran is whether the municipality enforcing a state law has enough discretion in implementation to make the municipality "responsible" for any constitutional violation that occurred.  See also Pembaur, 475 U.S. at 478 ("Monell is a case about responsibility.")  In this case, the parties agree that, on its face, Wis. Stat. § 118.51(7) does not give school districts a choice to comply.  It states that the school district "shall" reject transfer requests that "would increase racial imbalance in the school district."  Swatek v.

20

County of Dane, 192 Wis. 2d 47, 58-59, 531 N.W.2d 45, 49 (1995) ("The general rule is that the word 'shall' is presumed to be mandatory when it appears in a statute."). However, the difference between this case and Bethesda Lutheran is that defendant was not simply applying § 118.51(7) directly, but applying its own interpretation of the law in its own guidelines. Although the statute requires school districts to adopt a resolution "specifying . . . the limitation on transfers into or out of the school board under sub. (7)," Wis. Stat. § 118.51(4)(a)5, it does not tell the district *how* to "specify" that "limitation." Plaintiff argues that the discretion left to the school district is enough to make the policy its own and justify a damages award under § 1983.

a. Constitutional alternative

An important question is whether defendant could have applied Wis. Stat. § 118.51(7) in a manner that was consistent with the Constitution. If defendant had "various alternatives" in front of it, some constitutional, some not, but it made the "deliberate choice to follow a course of action" that violated the Constitution, Pembaur, 475 U.S. at 483, that would weigh heavily in favor of finding that defendant adopted an unconstitutional policy that caused plaintiff's injury. I need not decide the larger question whether the application of the statute necessarily would be unconstitutional if applied by other school districts. The Supreme Court made it clear in Parents Involved and many other cases that the validity of

21

using race in government decision making may be contingent on the particular government entity's reasons for doing so and its own peculiar history with race.  In this case, neither plaintiff nor defendant identifies any justification that defendant had for considering  race in making transfer decisions, so I must assume that it had no justification.

     Plaintiff identifies a number of reasons why she believes that defendant had a constitutional alternative.  First, plaintiff says that § 118.51(7) does not use the word "race" and that the phrase "increase racial imbalance" is a "broad and ambiguous term."  Plt.'s Br., at 11, dkt. #139.  She argues that the legislature simply wanted school districts to address various "demographic and social circumstances," id. at 12, in which race was only one of many factors.

     The aim of plaintiff in making this argument is clear.  She is trying to align Wis. Stat. § 118.51(7) with the diversity plan upheld by the Court in Grutter v. Bollinger, 539 U.S. 306 (2003), and the position of Justice Kennedy in Parents Involved.  (Because no single opinion in Parents Involved garnered a majority of the Court, Justice Kennedy's opinion is controlling, at least to the extent it represents "the narrowest grounds" for invalidating the two plans. Grutter, 539 U.S. at 325; see also Hart v. Community School Bd. of Brooklyn, New York School Dist. #21, 536 F. Supp. 2d 274, 283 (E.D.N.Y. 2008) (applying this rule to Justice Kennedy's opinion in Parents Involved).)  Both Grutter and Justice Kennedy emphasized that race may be an appropriate part of a diversity plan when race is considered

22

"as only one factor among many."  Grutter, 539 U.S. at 340; see also Parents Involved, 551 U.S. at 797-98 (Kennedy, J., concurring in part and concurring in the judgment) ("[A] district may consider it a compelling interest to achieve a diverse student population. Race may be one component of that diversity, but other demographic factors, plus special talents and needs, should also be considered.")

The problem with plaintiff's characterization of Wis. Stat. § 118.51(7) is that there is no basis for it in the actual language of the statute.  It is not plausible to suggest that a statute prohibiting an "increase in racial imbalance" is not a directive about race.  Social scientists may argue about the difficulty of defining "race" and question it generally as an accurate method of grouping populations, but no reasonable interpretation of the statute could lead one to believe that the legislature intended "race" to be a synonym for "demographic and social circumstances."  Under the plain language of the statute, race is the *only* factor that matters; it is not part of a larger diversity plan.

Plaintiff's second argument is that Wis. Stat. § 118.51(7) did not require defendant to define "racial imbalance" using a binary "minority/nonminority" classification. Defendant disagrees, arguing that it was required to use the definition of "minority" found in Wis. Stat. chapter 121, which is part of the Wisconsin's "special transfer aid" program. Wis. Stat. § 121.845(2) (defining "minority group pupil" as "a pupil who is Black or African American, Hispanic, American Indian, an Alaskan native, or a person of Asian or Pacific Island origin,

23

and who has reached the age of 4 on or before September 1 of the year he or she enters school"). The attorney general makes the same argument in his opinion in which he concludes that § 118.51(7) is unconstitutional. Opin. of Wis. Atty. Gen., OAG 4-07, 2007 WL 4928489, *9 (Dec. 20, 2007).

Neither plaintiff nor the attorney general cite any statutory language or authority showing that school districts are compelled to use chapter 121's definition of "minority group pupil" in defining a "racial imbalance." It seems that both made this assumption because § 118.51(7) applies only when a school district is "eligible for aid under subch. VI of ch. 121," even though the statute does not explicitly direct school districts to apply the definitions found in chapter 121.

I need not decide whether defendant was correct in assuming that it had to use the state's definition of minority. Its transfer policy could not have been saved by a more "nuanced" interpretation of "racial imbalance" that did not clump all minorities together in one group. It is true that the plurality and Justice Kennedy in <u>Parents Involved</u> criticized Seattle's plan for "viewing race exclusively in white/nonwhite terms." <u>Parents Involved</u>, 551 U.S. at 723 (plurality opinion); <u>see also</u> <u>id.</u> at 786 (Kennedy, J., concurring in part and concurring in the judgment) (Seattle "has failed to explain why, in a district composed of a diversity of races, with fewer than half of the students classified as 'white,' it has employed the crude racial categories of 'white' and 'non-white' as the basis for its assignment

24

decisions).  But it is clear from both opinions that the crux of the problem was not the particular definition of race; it was the use of race itself, except when it is being used to remedy past discrimination or contribute to a larger concept of diversity.  Id. at 723 ("The point of the narrow tailoring analysis in which the Grutter Court engaged was to ensure that the use of racial classifications was indeed part of a broader assessment of diversity, and not simply an effort to achieve racial balance, which the Court explained would be 'patently unconstitutional.'"); id.  ("[T]he plans here do not  provide for a meaningful individualized review of applicants but instead rely on racial classifications in a nonindividualized, mechanical way."); id. at 789 (Kennedy, J., concurring in part and concurring in the judgment) (school district must devise diversity plans "without treating each student in different fashion solely on the basis of a systematic, individual typing by race"); id. at 797-98 (Kennedy, J., concurring in part and concurring in the judgment) ("What the government is not permitted to do, absent a showing of necessity not made here, is to classify every student on the basis of race and to assign each of them to schools based on that classification.").

Third, plaintiff argues that defendants could have defined the word "imbalance" without resorting to "purely numerical" criteria or could have defined the word more generously so that more transfers would be allowed. Although plaintiff criticizes defendant's use of "numerical" criteria throughout her brief, she fails to identify an alternative method

25

that would be consistent with the statute.  Defendant could not have determined whether a transfer would "increase racial imbalance" using a qualitative measure rather than a quantitative one because the words "increase" and "imbalance" both denote numerical criteria.  The statute required defendant to determine the particular point at which the imbalance was increased.  There was no way to do this other than picking a number.

Plaintiff's argument about using different numerical criteria fails for the same reason as her argument about using a more "nuanced" definition of "racial imbalance."  "More lenient" criteria that allowed more transfers could not save the policy under Parents Involved.  Again, the problem with the plan in Seattle and Louisville was that they relied "on racial classifications in a nonindividualized, mechanical way," id. at 723, not that their definitions of racial imbalance were too miserly.  See also Reese v. Miami-Dade County, 2009 WL 3762994, *14 (S.D. Fla. 2009) (interpreting Parents Involved  to prohibit "student assignment plans" that "us[e] race as 'the factor' which alone determin[e]student assignments for some in a non-individual, mechanical way").  Neither the plurality nor Justice Kennedy even commented on the particular percentages the school districts used.

In sum, defendant could not have used the discretion it had to create a constitutional transfer plan that was consistent with Wis. Stat. § 118.51(7).  Even if defendant had not used a binary racial classification system or had allowed greater racial disparities within particular schools or the school district as a whole, its plan would still be unconstitutional

under <u>Parents Involved</u>. Defendant's transfer plan was unconstitutional not because of a particular interpretation of § 118.51(7), but because of the statute's directive to deny all transfer requests that would "increase racial imbalance." <u>Parents Involved</u>, 551 U.S. at 729-30 ("[O]utright racial balancing is patently unconstitutional.") (internal quotations omitted). <u>See also</u> <u>Fisher v. United States</u>, 2007 WL 2410351, *11 (D. Ariz. 2007) (concluding that <u>Parents Involved</u> prohibited policy that allowed student transfer if it "improves the ethnic balance of the receiving school and does not further imbalance the ethnic makeup of the home school" because "[w]hen the policy applies, student assignment is determined by race").

b.  "Less injurious" alternatives

Plaintiff's fallback position is that defendant could have minimized the constitutional injuries it inflicted by interpreting "racial imbalance" as broadly as possible.  According to plaintiff, even if all interpretations of Wis. Stat. § 118.51(7) would lead to an unconstitutional school district policy, defendant is still liable to plaintiff because it could have avoided her injuries as well as the injuries of other class members by using more "generous" numerical criteria to determine whether a particular transfer would create a "racial imbalance."  Plaintiff points out that all of the class members' transfer requests would have been granted if defendant had adjusted its criteria only slightly.

27

The parties have cited little authority on the question whether a municipality may be held liable for choosing a "more injurious" implementation of an unconstitutional state mandate.  Bethesda Lutheran did not address the question because the municipality in that case did not have any leeway under the statute.  The only case that either party cites is Caminero v. Rand, 882 F. Supp. 1319, 1326-27 (S.D.N.Y. 1995), which involved the question whether the city could be held liable for complying with a court order to involuntarily commit someone without making a finding of the person's dangerousness.  The court concluded that the city could be held liable because it could have sought reconsideration of the court order or filed a declaratory action challenging the constitutionality of the state statute under which the court order was issued.  Id. at 1326-27.  In a footnote, the court stated: "The Court makes no finding as to whether any of these . . . alternatives would have also left the City Defendants vulnerable to Plaintiff's constitutional challenges.  Even if these alternatives would not have prevented plaintiff's constitutional deprivation, however, they may have been able to reduce both the degree of that deprivation and the City Defendants' responsibility therefore."  Id. at 1327 n.13.  The court cited no authority for this proposition.

Caminero's view of municipal liability seems similar to that of the court in Davis, 657 F. Supp. 396, that a municipality may not simply accept the validity of state law, but must independently assess its constitutionality.  As defendant points out, that view was

28

overturned implicitly years later in <u>Vives</u>, 524 F.3d at 354-55, in which the Court of Appeals for the Second Circuit concluded that the relevant question was whether the municipality had discretion not to enforce a particular statute.  More important for this case, the holding of <u>Caminero</u> is inconsistent with <u>Surplus Store</u> and <u>Bethesda Lutheran</u>.  Although <u>Bethesda Lutheran</u> does not address the question raised by <u>Caminero</u>'s footnote, the undeveloped dicta in that footnote can hardly be described as authoritative.

There may be a colorable argument in some circumstances that a municipality retains a duty to do no more than is necessary to comply with an unconstitutional state directive. An extreme example would be a state law that required municipal officers to use a taser on anyone who used disrespectful language during a traffic stop.  If in response to such a directive a municipality adopted a policy that required officers to use the taser no fewer than five times, it would be difficult for the municipality to later deny that its policy was not the cause of any injuries resulting from shocks two through five.

However, the taser analogy is not instructive under the facts of this case because it is impossible to tell where the state's policy "ends" and where defendant's "begins" when it comes to out-of-district transfer decisions.  It is not as if defendant went above and beyond a clear benchmark provided by the state for determining what constitutes an "increase in racial imbalance."  If anything, defendant was already stretching the plain meaning of the statute, which suggests that school districts should not allow *any* transfers that would

29

increase an imbalance.  As plaintiff admits, defendant's application of the statute provided more leeway than a strict reading might suggest.

Plaintiff uses defendant's arguably expansive definition of the statute as evidence that defendant could have (and should have) allowed even more leeway than it did.  But this argument could be made regardless of the numerical criteria defendant adopted.  In other words, whatever percentages defendant chose, it could have chosen more "generous" percentages until it reached 100 percent.  Plaintiff suggests that defendant should have "pushed its luck," using the most generous percentages it could until the state forced it to be more restrictive.  But the relevant question under the standard for municipal liability is not what defendant could "get away with," it is whether a policy choice by defendant caused the constitutional violation.  <u>Monell</u>, 436 U.S. and 694.  In this case, the policy choice was made by the state:  to prohibit transfers that increase racial balance.  Although it was defendant that defined "increase racial balance," it did so in the context of trying to implement a state mandate and a state policy.  Plaintiff cannot attribute her injuries to the school district simply because a different, arbitrary percentage would have had the incidental effect of permitting her transfer.  <u>Cf.</u> <u>Ruehman v. Sheahan</u>,  34 F.3d 525, 529 (7th Cir. 1994) ("It does not follow, however, that only persons whose every step is guided by positive law are acting for the state. [The question is whether] "[t]hey exercise discretion in the name of the state.")

30

In sum, I conclude that a municipality cannot be held liable under § 1983 for efforts to implement a state mandate when the plaintiff cannot point to a separate policy choice made by the municipality. In that situation "it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury." Bethesda Lutheran, 154 F.3d at 718.

c.  Defying Wis. Stat. § 118.51(7)

Plaintiff's last argument is that defendant may be held liable because it made the "choice" to comply with Wis. Stat. § 118.51(7) rather than the Constitution. Although plaintiff advances a number of legitimate arguments in favor of this approach to municipal liability (mostly tracking the reasoning of Davis and Caminero), plaintiff recognizes that circuit precedent forecloses it. Under Bethesda Lutheran, 154 F.3d at 718, municipalities do not have to choose between following their own interpretation of the Constitution and putting themselves at "war with state government." Of course, plaintiff is free to ask the court of appeals to revisit its previous rulings, but that is not something this court can do.

Plaintiff suggests that the circumstances of this case justify a departure from the result in Bethesda Lutheran without contradicting its holding. In particular, plaintiff says that defendant was free to disregard the law if it chose, as demonstrated by what it views as the Department of Public Instruction's deferential review of defendant's transfer decisions and

31

the lack of any consequences from the state after defendant stopped complying with Wis. Stat. § 118.51(7), even though the statute has not been repealed and no court has held it to be unconstitutional.  Although plaintiff's view has some surface appeal, it fares no better under Bethesda Lutheran.  In that case, the state had suggested in a previous appeal that it "wink[ed] at violations of the residency requirement for placement in a restrictive facility," Bethesda Lutheran Homes and Services, Inc. v. Leean, 122 F.3d 443, 446 (7th Cir. 1997), but the court concluded that such assurances did not mean that the county had "discretion" to violate the law.  In this case, regardless whether the department provided meaningful review, it was still the state's policy that defendant was applying.

Further, little can be read into defendant's decision to stop complying with Wis. Stat. § 118.51(7).  This occurred only after the Supreme Court decided Parents Involved and the state (through the Department of Public Instruction) informed defendant that it would now "reverse any decision made by a school district relying on the racial imbalance" provision in Wis. Stat. § 118.51(7)(a).  At that point, defendant applied the state's "new" policy of making transfer decisions without relying on race.  In any event, even if defendant had stopped complying with § 118.51(7) without any new guidance from the state, this would not mean that defendant had been implementing its own policy (rather than the state's) while it was still following the statute.  It would mean only that defendant decided to *stop* implementing state policy and adopt a new, contrary policy at the risk of retribution from

32

the state.

### B. Claim under 42 U.S.C. § 1981

Section 1981 gives "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." The parties dispute whether § 1981 applies to a case like this one involving the use of race in student placement. (The parties do not dispute whether the scope of the statute is limited to claims brought by nonwhite citizens, as the phrase "as is enjoyed by white citizens" might suggest. The Supreme Court has held that section "1981 is applicable to racial discrimination . . . against white persons," concluding that the phrase "as is enjoyed by white citizens . . . simply . . . emphasiz[es] the racial character of the rights being protected." McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 287 (1976).)

Although defendant makes a strong argument in favor of a finding that § 1981 does not apply to this case, I need not resolve that question because I conclude that § 1981 uses the same municipal liability standard as § 1983. In Jett v. Dallas Independent School District, 491 U.S. 701 (1989), the Supreme Court held that Congress intended the standards under § 1983 for government actors to apply to government actors under § 1981.

33

This included the standard for proving municipal liability.  Id. at 735-36 ("[T]o prevail on his claim for damages against the school district, petitioner must show that the violation of his 'right to make contracts' protected  by § 1981 was caused by a custom or policy within the meaning of Monell and subsequent cases.").  Although Congress amended § 1981 shortly after Jett was decided, the circuits agree that Congress did not disturb Jett's holding regarding municipal liability.  E.g., Bolden v. City of Topeka, Kansas, 441 F.3d 1129, 1137 (10th Cir. 2006); Evans v. City of Houston, 246 F.3d 344, 358 (5th Cir. 2001); Federation of African American Contractors v. City of Oakland, 96 F.3d 1204, 1214 (9th Cir.1996); Randle v. City of Aurora, 69 F.3d 441, 446 n. 6, 447 (10th Cir. 1995); Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995); Williams v. Little Rock Municipal Water Works, 21 F.3d 218, 224 (8th Cir. 1994).  The Court of Appeals for the Seventh Circuit has not explicitly addressed the question whether the 1991 Amendments had any effect on Jett, but in several cases it has applied Monell to § 1981 claims brought against municipalities and has cited Jett as support.  E.g., Alexander v. City of Milwaukee, 474 F.3d 437, 448 (7th Cir. 2007) ("Section 1981, like § 1983, also requires a plaintiff to demonstrate an official policy or custom in order to allow for municipal liability."); McCormick v. City of Chicago, 230 F.3d 319, 324 (7th Cir. 2000).

Plaintiff does not point to any textual basis in § 1981 to question these holdings and she does not cite any cases in which a court has come to a contrary conclusion.  Instead, she

34

points to <u>Quinones v. City of Evanston</u>, 58 F.3d 275, 278 (7th Cir. 1995), in which the court stated that "no state may require a municipality to violate federal law." Of course, if the court of appeals had meant that statement to be a universal rule, it would not have taken the position it did in <u>Surplus Store</u> and <u>Bethesda Lutheran</u> that municipalities cannot be held liable for enforcing a state law mandate. In <u>Quinones</u>, the question was whether the rule of <u>Surplus Store</u> should be extended to the Age Discrimination in Employment. The court concluded that <u>Surplus Store</u> should not apply because employment discrimination statutes like the ADEA impose vicarious liability on employers. In other words, it is irrelevant under those statutes whether the municipality has an unlawful policy of its own; the only question is whether the employer (through its agents) violated the statute.

<u>Quinones</u> provides no reason to question the view that a municipality may not be held liable under § 1981 unless the municipality has a "policy" that is the "moving force" behind the constitutional violation. Thus, I conclude that plaintiff's claim under § 1981 fails for the same reason as her claim under §1983, that plaintiff's constitutional injury was not caused by a policy of the school district.


ORDER

IT IS ORDERED that

1. The motion filed by defendant Madison Metropolitan School District to amend

35

its answer to include a sovereign immunity defense, dkt. #42, is GRANTED as unopposed.

2.  Plaintiff N.N.'s motion to "strike improper argument in defendant's reply brief," dkt. #150, is DENIED as moot.

3.  Defendant's motion for summary judgment, dkt. #44, is GRANTED.

4.  The clerk of court is directed to enter judgment in favor of defendant and close the case.

Entered this 24th day of November, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

36